**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KWAINE THOMPSON,

　　　　　*Plaintiff*,

　　vs.

CITY OF NEW YORK, et al.

　　　　　*Defendants*.

Action No.  1:22-cv-1458-JPO-KHP

**RULE 56(d) DECLARATION OF SAMI ELAMAD IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Sami Elamad, pursuant to 28 U.S.C. § 1746 hereby declare and state as follows:

1.　　　　I am *pro bono* counsel for Plaintiff Kwaine Thompson ("Plaintiff" or "Mr. Thompson"), for the limited purpose of responding to the City's summary judgment motion.

2.　　　　I submit the following, pursuant to Fed. R. Civ. P. 56(d), as part of Plaintiff's response in opposition to Defendants' motion for summary judgment, ECF Nos. 83-87. *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994).

3.　　　　More specifically, this declaration is in further support of Plaintiff's argument for supplemental discovery, as previously explained in his Memorandum of Law in Opposition, ECF No. 111 ("Opp.") at 11–13. Irrespective of whether or not the Court grants summary judgment in the City's favor, at the very least, Plaintiff respectfully requests the Court consider deferring any ruling to allow him an opportunity for additional discovery. Fed.R.Civ.P. 56(d)(1).

4.　　　　However, that's not to say that Plaintiff believes there aren't genuine issues of material fact that wholly preclude summary judgment.

**Nature of Uncompleted Discovery**

Sexual Abuse (First Cause of Action)

5.     *Witnesses*. Plaintiff alleged claims of sexual abuse against some of the correctional officers (CO) as a pretrial detainee at Rikers. There are multiple witnesses who are relevant to these proceedings—including clinical staff (who Plaintiff confided in), non-party corrections officers (who Plaintiff disclosed abuse to), and other inmates detained during the relevant time period, among other examples.

6.     None of the CO Defendants were examined or deposed. Nor did any offer admissible evidence or testimony to refute Plaintiff's account. Besides them, there are several non-party CO's who may know of the alleged abuse, such as Officer Kingsley, who witnessed a heated, public brawl between Thompson and Defendant Brumfield in its entirety. *See* Opp. at 2 (June 13 Incident); Pl. 56.1 ¶¶ 21-26.[1] Kingsley was not even interviewed in the subsequent internal investigation by the Department of Corrections (DOC) about that specific incident. Pl. 56.1 ¶ 39.

7.     Additionally, Mr. Thompson has also identified a few clinical staff members—based on their description, physical traits, etc.— who he believes may possess relevant information. *See* 50H Tr at 43:5-10 ("a female psyche, and this white lady, she was very appalled at how this officer abuse her power") & 50:5-7 [Ex. 2]. Mr. Thompson frequently went to the clinic—where the sex acts alleged occurred, i.e., in the x-ray room—for his daily medications. He confided in clinical staff, who could corroborate his account and speak to the City's knowledge (or reason to know) of the allegations and so on.

---

[1] "Pl 56.1" refers to Plaintiff's Response and Counterstatement to Defendants' Local Rule 56.1 Statement, ECF No. 113. "Ex. __" refers to exhibits attached to the declaration of Sami Elamad, ECF No. 116. "50H Tr." is available at Exhibit 2 [ECF No. 116-2].

8.      Mr. Thompson has also provided me with the names of other inmates—potential witnesses—who could corroborate his account, which could be done by affidavit/declaration, etc.

9.      _Documentary evidence_. There is surprisingly little information about what prompted the UTI test or the priapism operation. Both could help clarify Plaintiff's sexual health/history and, by extension, the underlying allegations in the complaint. Recall that, while detained at Rikers, Mr. Thompson underwent surgery for priapism at Lincoln Hospital; he was also treated for a urinary tract infection (UTI) and received antibiotics. Pl. 56.1 ¶¶ 12–14. There are no records issued by Lincoln Hospital as well.

10.      Mr. Thompson has explained to me that several body-worn cameras captured his interactions with some of the CO Defendants. Meaning, there may be additional responsive video and photographic evidence. For example, there may be body-worn and handheld camera footage, both of which are used at Rikers.[2] Mr. Thompson added that Defendant Palmer-Campbell, in particular, wore a bodycam often, which could turn up further evidence of the two's history and relationship. None were produced in the discovery process, although there are a few references to camera footage in Plaintiff's inmate file (as produced by Defendants).

11.      Plaintiff's inmate file leaves many questions unanswered. To begin with, Plaintiff inexplicably bounced between various buildings—17 days at AMKC, 5 days at GRVC, 92 days at BKDC (to name a few)—until he eventually landed at VCBC (380 days), where most of the alleged abuse that would give rise to this suit occurred. In Thompson's view, the frequent transfers were arbitrary and part of an effort to solicit inmates' compliance.

---

[2] _See_ Courtney Gross, _After NY1 investigation, Department of Correction limits access to security video,_ NY1 News (Jan. 18, 2023), available at https://ny1.com/nyc/all-boroughs/public-safety/2023/01/19/after-ny1-investigation--department-of-correction-limits-access-to-security-video (last visited Apr. 16, 2024); Kelly Grace Price, _Shedding light on NYC jail commissioner's inaction shows what a different story he's telling_, City & State N.Y. (May 16, 2023), available at  https://www.cityandstateny.com/opinion/2023/05/commentary-shedding-light-nyc-jail-commissioners-inaction-shows-what-different-story-hes-telling/386392/ (last visited Apr. 16, 2024).

12.     Plaintiff alleged that, in exchange for his compliance and sexual acts, he received special treatment, gifts, and so on. *See* Pl. 56.1 ¶¶ 20, 32-34. Mr. Thompson was supposed to be on a 23-hour, around-the-clock lockdown with severe restrictions. Pl. 56.1 ¶ 6 (details of lockdown order). There is no disputing that Mr. Thompson was placed in minimum-security facilities (like VCBC) where inmates could socialize, make phone calls, and so on. And Plaintiff's inmate file (produced by Defendants) is uninstructive on the transfers.

13.     As one example of the quid-pro-quo system, Plaintiff alleges that he was exempted from court-ordered restrictions by the CO Defendants in exchange for his continued compliance and performing various sex acts. *E.g.,* Opp. at 1 ("Brumfield warned Plaintiff that if he disclosed their relationship, she would inform DOC leadership about the mistake in [his] housing").

14.     As another example, Plaintiff alleged that Palmer-Campbell gifted him a cell phone, which he used to message and communicate with some of the CO defendants. Mr. Thompson has provided me with that cell phone number and carrier information. He has also helped me access his various social media and email accounts—used while housed in GRVC— all of which reflect regular, frequent activity on Mr. Thompson's accounts.

Failure to Train, Theories of Liability, State-Law Claims (Remaining Causes of Action)

15.     *Witnesses.* On this record alone, it is practically impossible to discern the extent and degree of each defendant's knowledge related to Plaintiff's allegations. For instance, Plaintiff alleged making reports of his abuse to several CO's. *See* Pl. 56.1 ¶¶ 28 & 29. None were deposed or testified as part of the City's moving papers, however.

16.     One potential witness: Defendant Montague, who Plaintiff told about the Brumfield-related incidents several times. Pl. 56.1 ¶ 29. Both Brumfield and Montague were assigned to VCBC. *Id.* ¶ 4

17.     Nor were any guards interviewed for the various DOC investigations related to Plaintiff's complaints. Neither Brumfield nor Palmer-Campbell—who are central to Plaintiff's alleged sex abuse— were ever interviewed by DOC investigators.

18.     All told, is particularly difficult to prove that any of the defendants should have been aware of the abuse.

19.     *Documentary evidence*. The record is vague and varies about each CO Defendant's disciplinary history and personnel files. Compare Palmer-Campbell who "has no history of PREA cases," Ex. 7 at 4, with Brumfield whose disciplinary history is redacted, Ex. 4 at 5. Put simply, Plaintiff does not have any conclusive information about the CO Defendants' history and past complaints.

20.     There is also very little from the City's central database—otherwise known as Incident Reporting System (IRS)[3]—a computerized system which collects information about use-of-force incidents, as part of the City's document production. IRS may help to explain the apparent inactivity in the DOC investigations related to Plaintiff's PREA complaints. And more: IRS is only *one* of several computerized systems the City uses, although the discovery and document production contains few references.  *See, e.g.,* ECF Nos. 116-6 at 9 & 116-7 at 26.

21.     Equally important, questions remain about the DOC investigations into Plaintiff's complaint. It appears that once investigators took Mr. Thompson's initial report (for all three

---

[3] *See* Consent Judgment at 12-13, *Nunez v. NYC Dep't of Corrs.*, 1:11-cv-05845 (S.D.NY Oct. 21, 2015) [ECF Dkt. No. 209-1 at 15]; Letter from Dana Roth, Inspector General, to Comm. Cynthia Brann, NYC Dep't of Corrs. (Mar. 4, 2019), archived at https://perma.cc/4ED9-W3FS.

complaints), there wasn't much activity in the ensuing months. What's more, all three investigations picked up in speed around the same time that Plaintiff filed suit. *See* Ex. 4 at 20 (Feb. 24, 2022 email); Ex. 6 at 10 (Feb. 18, 2022 email); Ex. 7 at 38 (Feb. 23, 2022 email).

**How The Facts Sought Are Reasonably Expected To Create A Genuine Issue Of Material Fact**

22.     The he-said-she-said disputes of this case are precisely why further discovery would help this case's resolution, particularly for the sex abuse allegations.

23.     There likely won't be any witnesses to some abuse like the Brumfield allegations which occurred in the clinic's x-ray room (an area not under surveillance). Aside from that, the clinic's security camera footage has gaps in the video, among other things.

24.     The same is true with the allegations related to Defendant Palmer-Campbell. That's why, for example, cell phone records would be more conclusive in making these credibility determinations. *See supra* ¶ 14.

25.     Turning to the other causes of action—like failure-to-train, *Monell* liability, and the state law theories—Plaintiff will have to show that the City had reason to know of the abuse, Opp. at 11, or that there was no meaningful attempt to investigate by DOC, *id.* at 13 (citing, *inter alia*, *Velez v. City of N.Y.,* 2019 WL 3495642, at *6 (S.D.N.Y. Aug. 1, 2019).

26.     It is unclear what happened after DOC investigators took Mr. Thompson's initial reports (*supra* ¶ 21), or why there were months-long gaps in the investigations that suggest there was no activity or work done. If the DOC investigations were dilatory, IRS may help with answering that question.

27.     Relatedly, the City's IRS systems may shed light on the DOC investigations, including day-by-day activity and other information—which was not available in the City's document production.

28.     Also, Plaintiff is not committed to one type of discovery device or plan. Much of the above can be ascertained through different methods—e.g., subpoenas, interrogatories, depositions, and requests for admission—and requires further consideration by the parties and Court.

**<u>Previous Efforts Made</u>**

29.     From the start of these proceedings until now, Mr. Thompson has been incarcerated. And until recently, he largely proceeded here *pro se*, although he initially filed his complaint with counsel.

30.     Based on my conversations and understanding with both Mr. Thompson and defense counsel, Mr. Thompson has not been very successful or effective in gathering responsive information.

31.     Mr. Thompson has explained his past attempts to conduct discovery, including attempts to draft and serve subpoenas on the City and various non-party witnesses. None have yielded information or even a response.

32.     For instance, Mr. Thompson tried to serve subpoenas on Google and Facebook to collect evidence showing his communications with the CO defendants as well as his online activities. He could not just print those webpages from his computer since most correctional facilities do not allow access to Facebook or email accounts.

33.     Mr. Thompson has not served any requests (e.g., interrogatories, requests for admission) on the City, or conducted substantive discovery (e.g., deposition), based on my understanding.

34.     I cannot speak to any past discovery by Plaintiff's former counsel, who withdrew from this case in February 2023. ECF Nos. 54-56.

**Why Efforts Were Unsuccessful**

35.     To some extent, as an unrepresented litigant and one who is incarcerated, Plaintiff

has been significantly stymied in his ability to prepare and argue this case, conduct discovery,

gather relevant evidence, and present an adequate defense.

36.     While Mr. Thompson may be familiar with courts and the legal system, his

circumstances did not make it any easier. Illustratively, Mr. Thompson had a tough time even

trying to access/review the City's security camera footage, as he had explained to the Court. *E.g.,*

ECF Nos. 91, 100 (consistent issues in trying to review video evidence).

37.     Admittedly, supplemental discovery may cause further delays, but that is probably

not have any major or prejudicial effect on Defendants. Considering that the City requested

several 60-day stays/extensions throughout these proceedings, it seems reasonable for Mr.

Thompson to make a similar request. After all, he has patiently waited for almost two years

without protest to vindicate his constitutional rights. *See* Opp. at 3 (citing ECF Nos. 20, 33, 39);

*see also* ECF No. 51 (joint request).

38.     In the event that the Court finds this 56(d) request unsatisfactory, Plaintiff

respectfully requests an opportunity to fully brief and present arguments by motion to the Court.

39.     The foregoing is based on my personal knowledge, unless stated on information

and belief, and if called on to testify to those facts I could and would competently do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:       New York, NY
             April 18, 2024                    _____
                                               Sami Elamad