UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

KWAINE THOMPSON,

                           Plaintiff,

         -v-

CITY OF NEW YORK, *et al.*,

                         Defendants.

22-CV-1458 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    Plaintiff Kwaine Thompson brings this action asserting federal and state claims based on alleged sexual assaults that occurred while he was a pretrial detainee at the Vernon C. Bain Center ("VCBC") and the George R. Vierno Center ("GRVC") on Rikers Island, New York. Before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motion is granted in part and denied in part.

**I.    Background**

    **A.    Factual Background**

    The following facts are drawn from the parties' Local Rule 56.1 statements and responses. (ECF Nos. 86 ("Def. SOF"); 113 ("Pl. SOF"); 121 ("Def. Reply SOF").) Where necessary, additional citations to the record are included.

    During the relevant period covered by this action, Plaintiff Kwaine Thompson was a pretrial detainee on Rikers Island. Thompson was first incarcerated at VCBC starting in September 2020 (Pl. SOF ¶ 15), and later transferred to GRVC in October 2021 (*id.* ¶ 30). Starting in 2020, Thompson alleges that he experienced sexual abuse at the hands of several

correction officers.[1]  For purposes of summary judgment, Thompson relies almost entirely on his own sworn testimony, including a deposition and a 50-h hearing on his state-law claims.[2]

While at VCBC, Thompson alleges that he was abused by Defendants Katrese Brumfield and Jessica Simmons.  According to Thompson, he first met Brumfield and Simmons shortly after he arrived at VCBC.  (*Id.* ¶¶ 15, 18.)  Thompson states that both Brumfield and Simmons "sought to develop a personal relationship" with him (*id.* ¶¶ 16, 18), and that he then "engaged in various sexual acts" with both officers (*id.* ¶¶ 17, 19).  "In exchange for sexual favors, both Brumfield and Simmons rewarded [him] with gifts, food, and illicit drugs."  (*Id.* ¶ 20.)  In his 50-h testimony, Thompson recounts multiple instances of abuse by both Brumfield and Simmons.  (*See* ECF No. 196-1 ("Pl. 50-h") at 32:12 (Brumfield), 37:15 (Simmons).)  In his deposition testimony, however, Thompson appears to recount only one discrete instance of abuse by Brumfield and one by Simmons.  (*See* ECF No. 196-2 ("Pl. Dep.") at 13:3, 51:19-23.)  In his 50-h testimony, Thompson states that Defendant Tiffany Francis was present for at least one of his sexual encounters with Simmons.  (*See* Pl. 50-h at 40-41.)

On June 13, 2021, Thompson and Brumfield "had a heated exchange" in the dayroom while other prisoners and guards were present.  (Pl. SOF ¶¶ 21, 26.)  Thompson provides a security camera recording of the confrontation, though there is no corresponding audio.  (ECF No. 112-9.)  According to an entry in the prison logbook for that date, written by Brumfield, "CO Brumfield 14438 on post to pick up inmate Thompson, Kwaine for clinic DOT medication

---

[1] Thompson also alleges that he experienced instances of physical and sexual abuse while incarcerated at Rikers Island prior to 2020 (*see, e.g.*, Pl. SOF ¶¶ 9-11), but those are not at issue in this litigation.

[2] New York General Municipal Law Section 50-h provides for an examination under oath of any claimant in an action against a city. *See* N.Y. Gen. Mun. L. § 50-h (2014).

inmate Thompson refused stating that he is not going unless C.O. Simmons is escorting him." (Def. Reply SOF ¶ 23; Pl. SOF ¶ 24.) According to Brumfield, Thompson confronted her about her logbook entry "using profanity and calling [her] a liar," and she responded by "tell[ing] him that he was a loser, a clown, and a dirty creep." (ECF No. 112-4 at 12; *see also* Pl. SOF ¶ 42.) According to Thompson, Brumfield told him "[he] better not be giving her dick to nobody" in front of multiple witnesses. (Pl. SOF ¶ 25.)

The next day, Thompson reported the incident and his alleged "sexual abuse" by Brumfield to the New York City Department of Correction ("DOC") Prison Rape Elimination Act ("PREA") hotline.[3] (ECF No. 112-4 at 3; *see also* Pl. SOF ¶ 27.) Thompson testified that he also "disclose[d] his inappropriate relationship with Brumfield to other Rikers staff." (Pl. SOF ¶ 28.) This included Defendants Tony Montague and Chandra Davis. (Pl. Dep. at 23-24; *see also* Pl. SOF ¶ 29.) In October 2021, Thompson was transferred to GRVC. (Pl. SOF ¶ 30.)

Once at GVRC, Thompson met Defendant Debbie Palmer-Campbell, who he alleges "began making sexual advances and remarks" to him. (*Id.* ¶ 31.) On December 3, 2021, Thompson called the PREA Hotline to follow up on his previous complaint concerning Brumfield. (*See* ECF No. 112-6 at 5.) In one of his DOC interviews following this call, he also stated that he was being "retaliated against" and "targeted by other officers" in GRVC, including "Captain Palmer[-]Campbell," who was threatening to deny him various privileges unless he engaged in sexual conduct with her. (*Id.*) In his statement of facts, 50-h testimony, and deposition, Thompson recounts being sexually assaulted in December 2021 in the GRVC clinic by Palmer-Thompson. (*See* Pl. SOF ¶ 43; Pl. 50-h at 50:20-24, 52:2-53:7; Pl. Dep. 70:11-71:12.)

---

[3] Documents show that Thompson reported the incidents to "311 constituent services"—a New York City DOC service—not to the New York State Department of Corrections and Community Supervision PREA hotline. (*See, e.g.*, ECF No. 112-7 at 3.)

3

This is the only sexual assault by Palmer-Campbell that Thompson specifically alleges.[4] Thompson again called the PREA Hotline on December 19, 2021, this time to report his allegations concerning Palmer-Campbell. (*See* ECF No. 112-7 at 3.)[5]

Thompson alleges that, in August 2022, he "refused to participate" in any further sexual acts with Palmer-Campbell. (Pl. SOF ¶ 35.) Thompson alleges that "retaliation happened" when he "backed out of the deal," referring to an alleged arrangement wherein he would receive preferential treatment in exchange for sexual favors for DOC guards, including Palmer-Campbell. (*Id.*) Thompson does not, however, identify specific instances or forms of such retaliation. (*Id.*)

### B.   Procedural Background

Thompson filed this action on February 22, 2022 (ECF No. 1) and filed the operative complaint on October 21, 2022 (ECF No. 45 ("SAC")). After the completion of discovery (*see* ECF No. 73), Defendants filed a motion for summary judgment on December 5, 2023 (ECF No.

---

[4] Thompson's Rule 56.1 statement does also state that "[i]n exchange for sexual favors for Captain Palmer, as relevant here, Plaintiff received special treatment from the officers." (Pl. SOF ¶ 32.) While this phrasing seems to imply multiple instances of abuse by Palmer-Campbell, it is based on a misstatement of Thompson's testimony. The cited testimony in fact refers to different episodes in which other officers—not named in this lawsuit—threatened Thompson with retaliation if he did not perform sexual favors for various correction officers, one of whom was Palmer-Campbell. (Pl. Dep. at 52:7-9; 67:6-19.) Of note, Thompson's 56.1 statement was prepared by pro-bono counsel who was serving in a limited scope for purposes of opposing summary judgment and who may not have had an adequate grasp of the entire record. In any event, the Court is not inclined to hold counsel's imprecise paraphrasing of Thompson's deposition against him by deeming his testimony incredible as a matter of law.

[5] In his 56.1 statement, Thompson writes that he "disclosed the allegations related to Palmer-Campbell to other Rikers staff and officers," but the record citations provided in support of that fact do not substantiate it. (Pl. SOF ¶ 37.) While Defendants "[a]dmit that plaintiff testified as such," they also "dispute this fact." (Def. Reply SOF ¶ 37.) Because Local Rule 56.1 requires statements of fact to "be followed by citation to evidence," the Court declines to hold that Defendants have formally admitted that Thompson reported Palmer-Campbell's conduct to other Rikers staff, notwithstanding Defendants' imprecise phrasing.

83), along with a supporting memorandum of law (ECF No. 87 ("Mem.")).  Thompson opposed summary judgment on April 5, 2024 (ECF No. 111 ("Opp.")), and Defendants replied in support of their motion on April 19, 2024 (ECF No. 120).  Thompson requested leave to file a sur-reply addressing Defendants' argument that Thompson had abandoned some of his claims (ECF No. 123), which was granted by Magistrate Judge Parker (ECF No. 124).  Thompson filed his sur-reply on May 28, 2024.  (ECF No. 125.)  The parties filed a series of statements of material facts in connection with their briefs.  (*See* Def. SOF; Pl. SOF; Def. Reply SOF.)

Thereafter, the Court granted Thompson's Rule 56(d) request to reopen discovery on matters related to Defendants' motion for summary judgment.  (ECF No. 129.)  Following the completion of this additional discovery, Thompson filed a renewed opposition to summary judgment on January 3, 2025 (ECF No. 171), and Defendants replied again in support of their motion on January 14, 2025 (ECF No. 179).  On March 4, 2025, Thompson, acting on his own behalf, wrote a letter to the Court requesting that he be "plac[ed] in protective custody" based on his "fear of . . . retaliation" while incarcerated at Rikers.  (ECF No. 191.)  Defendants opposed this request in a letter on March 10, 2025.  (ECF No. 192.)

On March 12, 2025, the Court instructed Thompson's counsel to file complete transcripts of Thompson's deposition and 50-h examination (ECF No. 193), which counsel did on March 18, 2025 (ECF No. 194).

## II.     Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557

U.S. 557, 586 (2009). In deciding a motion for summary judgment, a court must consider the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).

Although represented by counsel for the filing of all three iterations of the complaint in this case and for purposes of opposing summary judgment, Thompson has also proceeded *pro se* at times in this litigation, including at his October 13, 2023 deposition. (*See* Pl. Dep. at 2.) "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (cleaned up), including at summary judgment, *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). This leniency extends to materials produced while a party was acting *pro se*, even if that party later secures professional counsel. *See Edmonson v. Abate*, No. 91-CV-4979, 1997 WL 38089, at *2 (E.D.N.Y. Jan. 21, 1997) ("Although plaintiff is now represented by counsel, he drafted and filed the amended complaint *pro se* and his pleadings will therefore be construed liberally."). That said, such liberal construction "does not relieve [Thompson] of his to meet the requirements necessary to defeat a motion for summary judgment," *Jorgensen*, 351 F.3d 50.

III.   Discussion

    A.   Federal Claims

        1.   Direct Sexual Assault

Defendants' primary response to Thompson's federal sexual assault claims is that Thompson's own testimony is so unreliable that a reasonable jury could not credit it as true. (Mem. at 11.) While recognizing that "[i]t is axiomatic that courts should not assess credibility on summary judgment," Defendants maintain that this is one of the rare cases in which "evidence is so contradictory that it cannot be believed by a reasonable person." (*Id.* at 11-12 (quoting

6

*Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476 (S.D.N.Y. 2003), *aff'd sub nom.*, *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005)); *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (affirming a grant of summary judgment based on "inconsistencies between the facts advanced by [the plaintiff] in opposition to summary judgment and those alleged in her original and amended complaints, in sworn interrogatory responses, in portions of her deposition testimony, in her complaints before the EEOC, and in prior sworn testimony").)

As the facts in *Jeffreys v. City of New York* illustrate, this exception is a narrow one. There, the plaintiff brought a Section 1983 excessive force claim against police officers who he alleged threw him out of a window while attempting to arrest him for burglary. 426 F.3d at 551. The plaintiff relied solely on his own testimony and affidavits of family members to make his case. *Id.* at 552. However, prior to suing the City, he confessed on three separate occasions to having voluntarily jumped from the window and failed to mention police misconduct at any time during his prosecution for the burglary. *Id.* The plaintiff was also unable to recall any identifying features of the officers who had allegedly thrown him from the window, nor even how many officers were present when it occurred. *Id.* Medical personnel who examined the plaintiff directly after the alleged assault reported no evidence of head trauma, directly contradicting his claim that he had been hit in the head with a flashlight by the police. *Id.* at 552-53. Weighing this record, the Second Circuit affirmed the district court's conclusion that "permitting Jeffreys to present such incredulous testimony at trial would be a terrible waste of judicial resources and a fraud on the court." *Id.* at 553 (quoting *Rossi*, 275 F. Supp. 2d at 477-78).

Other cases in this circuit confirm that *Jeffreys* applies only in exceptional circumstances. For example, in *Aziz Zarif Shabazz v. Pico*, the plaintiff's medical records contradicted virtually

7

all his claims of serious physical injuries at the hands of prison officials. *See* 994 F. Supp. 460, 469-70 (S.D.N.Y. 1998). And in *Rojas v. Roman Catholic Diocese of Rochester*, the plaintiff presented substantial new facts in opposition to summary judgment that contradicted her complaint and prior sworn statements. 660 F.3d at 105-06.

This is not such an extreme case that it falls within the scope of *Jeffreys*. The principal inconsistencies in Thompson's testimony concern the frequency of the alleged sexual assaults. Specifically, while Thompson's statement of facts and 50-h testimony recount numerous assaults by both Brumfield and Simmons, Thompson testified in his deposition that he was assaulted just "[t]hree times." (Pl. Dep. at 13:1-3; *see also id.* at 51:19-23.)

As an initial matter, Thompson's deposition was taken while he was *pro se*, in contrast with his 50-h testimony and his statement of material facts at summary judgment. While "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony," the rule does not apply with the same force to conflicting depositions when both were taken well in advance of summary judgment. *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (explaining that the purpose of the affidavit rule is to avoid self-serving affidavits filed solely to avoid summary judgment on "sham issues of fact" (cleaned up)). It applies even less so when the deponent "was not represented by counsel" at one of the depositions, or where the deponent "had conducted only limited discovery *pro se*" when the deposition was taken. *Id.* Here, Thompson's story—that he was assaulted more than once each by Brumfield and Simmons—has remained consistent outside of his *pro se* deposition. The Court is therefore hesitant to bind Thompson based on that deposition alone.

8

Second, Thompson's deposition testimony is "only arguably contradictory" with his 50-h testimony and statement of facts. *Cf. id.* While Thompson does reiterate at various points in his deposition that he was only assaulted on three "instances" (*see, e.g.*, Pl. Dep. at 51:14-23), there is some reason to think that Thompson meant to refer to the three *officers* who assaulted him, rather than to three isolated *sex acts*.[6] For example, in posing questions to Thompson, defense counsel used phrasing like "[w]as *Officer Brumfield* the first sexual assault *incident* . . . ." (*Id.* at 48:5-6 (emphasis added).) Thompson also responded to questions about "other instances" by noting that he "made complaints on other officers." (*Id.* at 52:4-5.) Similarly, Thompson appears to flip back and forth between responding to defense counsel's language of "instances" and describing what appears to be ongoing rather than isolated sexual conduct. (*See, e.g.*, *id.* at 119:15-120:13 (describing how Thompson was denied visitation privileges until he "went back" to complying with officers' sexual requests," but then agreeing that he "attribute[d] all of that to these three instances we discussed today").) And Thompson testified that he continued to have regular contact with at least Brumfield following the first time that she allegedly assaulted him in the VCBC clinic area. (*See id.* at 42:21-43:5.) Professional counsel might have objected to defense counsel's ambiguous phrasing, but left to his own devices, Thompson did not. (*See id.*) Finally, Thompson's clearest statement that he was assaulted "three" times also came in response to defense counsel asking "approximately" how many times he was assaulted. (*Id.* at 13:1-3.) While the above may not be the most likely reading of Thompson's words, a reasonable jury could understand his deposition testimony in this manner, particularly if explained further by credible testimony at trial. (*Id.* at 13:1.)

---

[6] Thompson does say "it was three times," but in response to defense counsel's question whether Thompson "had three instances of sexual assault." (Pl. Dep. at 51:16-21.)

Third, Thompson testified that he has difficulty recalling the precise details of his assaults, as they were "very, very traumatizing" and that he "tr[ies] to block [them] out of [his] mind." (*See, e.g.*, *id.* at 21:2-3; *see also* Opp. at 12 (outlining reasons sexual assault victims might have difficulty recalling details about their assaults).) Thus, "while [Thompson] presented contradictory recollections in [his] deposition testimony . . . the Court is unwilling to accept that a reasonable jury would necessarily find on this basis that the . . . allegation was wholly fabricated; surely, a victim can have a cloudy memory of a traumatic incident," or incidents. *Cf. Nelson v. Disboro*, No. 918-CV-657, 2020 WL 7021583, at *3 (N.D.N.Y. Nov. 30, 2020). Defendants are, of course, free to point to Thompson's deposition at trial to attack his credibility or to limit damages, but the Court declines to grant summary judgment either dismissing his claims or formally limiting his claims to only three discrete incidents.

Beyond identifying inconsistencies in Thompson's own testimony, Defendants also present limited evidence from DOC records that they say undermines Thompson's account. While undisputed documentary evidence controverting a non-movant's claims may sometimes justify granting summary judgment, the bar is high. *Cf. Scott v. Harris*, 550 U.S. 372, 378-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (same). Addressing each of Defendants' challenges in turn, the Court is unpersuaded that they have met that high bar.

First, Defendants claim that Thompson's allegations are inconsistent with what he told DOC investigators following up on his three PREA complaints. (Mem. at 14, 18.) But only notes kept by DOC employees about Thompson's PREA interviews are available, rather than

10

transcripts, and Defendants do not contend that Thompson's interviews were taken under oath. Thompson also avers that he was and continues to be afraid of retaliation from Rikers staff. (*See, e.g.*, Opp. at 12; ECF No. 191.)  Whether or not this fear is well founded, it may explain Thompson's lack of forthrightness and candor when interviewed by DOC investigators.  And the Second Circuit has made clear that "if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Jeffreys*, 426 F.3d at 555 n.2 (cleaned up).  Thus, while contradictions between Thompson's DOC interviews and his later testimony might affect his credibility before a jury, they are not a sufficient basis for summary judgment.

      Second, Defendants argue that Thompson's medical records prove that he was not diagnosed with chlamydia during the relevant period, contradicting his allegations to the contrary.  (*Compare* Pl. Dep. at 64:5-12 *with* ECF No. 85-6.)  But even if Thompson's medical records lack a chlamydia diagnosis, that allegation is only a small part of his overall case.  In addition, Thompson's medical records do show that he was diagnosed with an unspecified urinary tract infection (UTI) in September 2021.  (ECF No. 112-3 at 4.)  A reasonable alternative explanation for this factual inconsistency, then, is that a prisoner without a nuanced understanding of medicine might not understand the difference between a generic UTI and chlamydia.

      Third, Defendants present security camera footage of the GRVC clinic on the night that Palmer-Campbell allegedly assaulted Thompson, which appears to show that no such assault occurred.  (ECF No. 85-3.)  As an initial matter, this argument at most only counters Thompson's claims as to Palmer-Campbell, not Brumfield or Simmons.  And while the video

records of the GRVC clinic do cast doubt on Thompson's narrative, they are not dispositive at this stage in the proceedings. Defendants' video footage covers less than ten minutes, and admittedly "does not run continuously." (*See* Pl. SOF ¶ 44; Def. Reply SOF ¶ 44.)[7] While Defendants explain this by noting that "the cameras activate based on motion" (Def. Reply SOF ¶ 44), they do not expressly state that they provided all the available footage from the entire night in question. The timestamps on the video also do not align precisely with Thompson's account of the assault, which he says occurred between 15 and 45 minutes before the period covered by the video. (*Compare* Pl. Dep. at 70:23-71:12 *with* ECF No. 85-3.) The video may contradict Thompson's claim that he "immediately g[o]t up and . . . g[o]t escorted back to [his] housing unit," but that specific timing allegation is not central to his claim. (*Cf.* Pl. Dep. at 71:13-14.)[8] In addition, Thompson alleges that at least part of the assault occurred while he was lying down in the clinic (Pl. Dep. at 77), which is not shown on the security camera footage provided by Defendants (*cf.* ECF No. 85-3). Nor does the video show what, if anything, happened between Thompson and Palmer-Campbell in the hallway outside the clinic, or in the clinic examination rooms. (*Id.*) The security camera footage also lacks audio, which limits the Court's ability to conclude that it represents the totality of Thompson's interaction with Palmer-Campbell. *Cf. Singh v. City of New York*, No. 23-24-CV, 2024 WL 319117, at *6 (2d Cir. Jan. 29, 2024) (summary order) ("[T[he video in this case lacks sound and, thus, does not allow a factfinder to

---

[7] Thompson's reference in his statement of facts to "that December 20 evening" (rather than December 18, the night on which the alleged assault occurred) appears to be an inadvertent typo. (*See* Pl. SOF ¶ 44.)

[8] Thompson also said something similar about the timing in an interview with DOC investigators. (ECF No. 112-7 at 7 (stating that Palmer-Campbell "approached him to take him back [to his cell] at which point 'she tried to grab his crotch but he pulled away'").) As explained above, though, only DOC notes are available from that interview, and the interview was not taken under oath. This limits the Court's ability to grant summary judgment based on inconsistencies between Thompson's later sworn testimony and his earlier unsworn interview.

consider the nature and tone of the exchange."). Thompson's story is therefore not "blatantly contradicted by the record, so that no reasonable jury could believe it." *Cf. Scott*, 550 U.S. at 380.

Because there is a genuine dispute of fact as to whether Brumfield, Simmons, and Palmer-Campbell sexually assaulted Thompson, the Court declines to grant summary judgment for Defendants on Thompson's Section 1983 claims against them.

### 2. Failure to Intervene

Thompson also asserts Section 1983 claims against Defendants Francis, Davis, and Montague based on their failure to intervene to stop the alleged sexual assaults by Brumfield and Simmons. Defendants respond that Francis, Davis, and Montague were not present for the assaults, nor on notice of Brumfield's and Simmons's propensity to assault Thompson. (Mem. at 21-22.) Notably, Defendants do not argue that Francis, Davis, and Montague lacked the authority to intervene, only that they lacked notice and opportunity to do so. Defendants do not assert any kind of immunity.

Thompson does allege that Francis was present for at least one of Simmons's sexual encounters with Thompson, and that Francis reacted by making light of the situation. (Pl. 50-h at 40:14-41:12.) Thompson also alleges that he continued to have nonconsensual sexual encounters with Simmons after Francis became aware of the situation. (*Id.* at 41:13-25.) A reasonable juror could therefore infer that Francis was aware of Simmons's propensity to abuse Thompson, and of the fact that such abuse was occurring, and yet acted recklessly in failing to mitigate that risk. Thompson's Section 1983 claim against Francis therefore survives.

Regarding Davis and Montague, Defendants are correct that Thompson does not allege that they were present for any instances of sexual assault. Thompson does, however, allege that he reported his first sexual assault by Brumfield to both Davis and Montague after it occurred.

13

(Pl. Dep. at 23:15-21.)  And Thompson alleges that Brumfield continued to sexually assault him thereafter.  (Pl. 50-h at 32:12.)  Thus, a reasonable jury could infer that Davis and Montague were aware and recklessly failed to act to mitigate the risk of further assaults by Brumfield.  Thompson's Section 1983 claims against Davis and Montague therefore survive.

### 3. *Monell* (Municipal Liability)

In Thompson's opposition to summary judgment, he references a *Monell* claim against the City for failure to supervise.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  The operative complaint does not, however, assert any discernible federal causes of action against the City.  "A claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim," and "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion."  *Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order).

In any event, to prevail on a *Monell* claim, Thompson would need to show that the City's failure to supervise or intervene "took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality."  *Missel v. County. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (summary order).  However, Thompson has not pleaded or adduced facts showing that such a policy existed, or that any of the officers involved in his allegations held policymaking authority.

Accordingly, to the extent that Thompson intends to assert a *Monell* claim against the City, that claim is dismissed.

### B. State Law Claims

#### 1. Claims Against Palmer-Campbell

Defendants first argue that Thompson failed to file a notice of claim as to Palmer-Campbell, which "is a statutory precondition for a lawsuit against a municipality or any of its officers." (Mem. at 27); *see also Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 174-75 (S.D.N.Y. 2003).[9] According to Defendants, Thompson never filed such a notice with respect to Palmer-Campbell. (Mem. at 27.) Thompson concedes that he did not file a notice and argues only that "multiple exceptions . . . may apply." (Opp. at 17). As support for these supposed exceptions, Thompson cites two inapposite cases about the Federal Prison Litigation Reform Act. (*Id.* (citing *Hosannah v. Officer Ameed Saeed*, No. 15-CV-03773, 2022 WL 21783687, at *10 n.11 (E.D.N.Y. Dec. 28, 2022); *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016)).) Whatever the Court's power to toll the requirements of that federal law, "federal courts do not have jurisdiction to permit the filing of a late notice of claim" as required by New York statute. *Warner*, 256 F. Supp. 2d at 175. The one relevant case that Thompson cites merely suggests that a notice of claim need not specify every legal cause of action against a defendant. *M.T. v. City of New York*, 325 F. Supp. 3d 487, 500 n.16 (S.D.N.Y. 2018). Here, however, Thompson failed to file a notice of claim at all as to Palmer-Campbell. The Court therefore grants Defendants' motion for summary judgment on Thompson's state-law claims against Palmer-Campbell. The remainder of this opinion only refers to Palmer-Campbell where her conduct forms of the basis of liability as to another defendant.

---

[9] Defendants cite N.Y. General Municipal Law Section 50-e, which specifies the procedure for filing a notice of claim. The actual requirement to file such a notice in a case like this is located in Sections 50-i and 50-j. *See* N.Y. Gen. Mun. L. §§ 50-i, j.

### 2. Sexual Assault and Battery

Thompson asserts claims for sexual assault and battery against Brumfield and Simmons. (SAC ¶¶ 116-21.) Defendants do not move for summary judgment on any independent basis as to these claims. Because the Court has already determined that Thompson has adduced sufficient evidence of sexual assaults by Brumfield and Simmons to proceed to trial on his Section 1983 claims, summary judgment is denied as to his analogous state-law claims.

### 3. Negligence

Thompson asserts claims for ordinary negligence against Defendants Davis, Francis, and Montague, and against the City based on failure to intervene and *respondeat superior* theories. (SAC ¶¶ 122-37.) Defendants move for summary judgment on these claims on two grounds. First, Defendants contend that Thompson cannot assert a negligence claim based on intentional conduct. (Mem. at 23.) But Thompson only alleges that Brumfield, Simmons, and Palmer-Campbell committed intentional torts. *See supra* Section III.A.1. His claims against Davis, Francis, Montague, and the City can be interpreted as sounding in traditional theories of negligence. *See supra* Section III.A.2.

Second, Defendants argue that Thompson cannot maintain a negligence action as "an alternate theory for the traditional remedies such as a claim for excessive force." (Mem. at 23.) The cases Defendants cite, however, hold only that New York does not provide a negligence cause of action for false arrest or malicious prosecution. (*See id.* (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 421 N.Y.S.2d 740, 743 (4th Dep't. 1979)); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 396 n.3 (S.D.N.Y. 2008) (same)).) Thompson's negligence claims against Davis, Francis, Montague, and the City are also not duplicative of his direct sexual assault claims against Brumfield, Simmons, and Palmer-Campbell, as they concern different conduct and are brought against

16

different parties. Finally, in any event, the Federal Rules authorize alternative pleading, even if simultaneous recovery would be barred. *See* Fed. R. Civ. P. 8(a). Thompson's ordinary negligence claims thus survive Defendants' motion for summary judgment.

### 4. Negligent Hiring and Retention

Thompson asserts claims for negligent hiring and retention against the City based on the sexual assaults committed by Brumfield, Simmons, and Palmer-Campbell. (SAC ¶¶ 138-47.) Defendants' only response is that the City was not on notice of those individuals' propensity to commit sexual assault. (Mem. at 24.) However, as explained above, Thompson testified that Officers Davis, Francis, Montague were aware of the sexual assaults. (Pl. Dep. at 23:15-21 (Davis and Montague); Pl. 50-h at 40:14-41:12 (Francis).) Thompson also filed not just one, but three separate PREA complaints about the alleged misconduct during the relevant period. (ECF Nos. 112-4; 112-6; 112-7.) Thompson has therefore adduced sufficient evidence that the City was on notice of the Defendant officers' propensities to create a genuine dispute of material fact and proceed to trial.

### 5. Infliction of Emotional Distress

Thompson asserts claims for intentional infliction of emotional distress (IIED) against Defendants Brumfield and Simmons, and for negligent infliction of emotional distress (NIED) against Defendants Davis, Francis, Montague and the City. (SAC ¶¶ 148-53.) Regarding Brumfield and Simmons, Defendants correctly argue that Thompson cannot pursue an IIED claim because the "challenged conduct falls well within the ambit of other traditional tort liability." *Goolden v. Wardak*, No. 19-CV-6257, 2020 WL 4271695, at *6 (S.D.N.Y. July 23, 2020) (quoting *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015)) (dismissing IIED claims based on an alleged sexual assault). Thompson's NIED claims against Brumfield and Simmons

must also fail because the challenged conduct was intentional in nature. *See Santana v. Leith*, 985 N.Y.S.2d 147, 149 (2d Dep't 2014).

Regarding the City, New York "public policy bars claims sounding in [IIED] against a governmental entity," *Shahid v. City of New York*, 208 A.D.3d 1380, 1380 (2d Dep't 2022) (quotation marks omitted), but does not bar NIED claims. *See also Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 299 (S.D.N.Y. 2015) (dismissing an IIED claim on public policy grounds but evaluating a NIED claim on the merits); *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 400-01 (S.D.N.Y. 2007) (same).

Defendants' only other arguments are that Thompson's NIED claim against the City "arise[s] from the same conduct as his sexual assault claims," and that "all the allegedly wrongful conduct in this case . . . are [sic] *intentional* in nature." (Mem. at 26 (emphasis in original).) But Thompson's claim against the City is not coextensive with his assault and battery claims against the individual officers, since it is based on the City's failure to supervise those officers and intervene in their misconduct once the City was on notice. Similarly, Thompson's claim against the City is also not based on intentional conduct, as he never alleges that the City intentionally induced or encouraged Brumfield, Simmons, or Palmer-Campbell to assault him.

While Defendants might have raised other objections, they have not done so, and the Court will not impute such arguments on their behalf. The Court therefore declines to grant Defendants' motion as to Thompson's NIED claim against the City.

### 6. Gender Motivated Violence

Finally, Thompson asserts claims under New York City Administrative Code Section 10-1104, which creates a civil cause of action for a "crime of violence motivated by gender." Defendants' only argument, other than again denying the substance of Thompson's allegations, is that "there is no evidence in the record that demonstrates that any alleged sexual assault was

18

motivated by [Thompson's] gender." (Mem. at 27.) However, Thompson does not address this argument in his opposition to summary judgment. The Court therefore deems Thompson's Section 10-1104 claims abandoned and dismisses them accordingly. *See Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 n.65 (S.D.N.Y. Sept. 30, 2009), *aff'd*, 396 F. App'x 781 (2d Cir. 2010) (summary order) (collecting cases).

      **C.**    **Thompson's Request for Protection**

Thompson recently filed a letter with the Court expressing a fear of retaliation while incarcerated at Rikers and requesting that he be placed in protective custody. (ECF No. 192.) Thompson does not, however, articulate any facts from which the Court can identify a credible risk of retaliation or other harm. Counsel for the City also attests that none of the individual defendants in this case are still working in the facility where Thompson is residing, and that it is unlikely that any of them will have contact with Thompson. (*Id.*) Thompson's request is therefore denied. Thompson may, however, renew his request should he become aware of any facts that might substantiate his fear of retaliation, or should it become clear that he will be at risk of contact with the defendants in this case.

**IV.**    **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is granted as to Thompson's putative *Monell* claims against the City, all of Thompson's state-law claims against Palmer-Campbell, Thompson's intentional infliction of emotional distress claims, Thompson's negligent infliction of emotional distress claims against Brumfield and Simmons, and Thompson's claims pursuant to New York City Administrative Code Section 10-1104. The motion is otherwise denied.

Thompson's request to be placed in protective custody is denied without prejudice to renewal should new facts become available.

19

       The Clerk of Court is directed to close the motion at Docket Number 83.

       SO ORDERED.

Dated: March 26, 2025
       New York, New York

                                                           J. PAUL OETKEN
                                                    United States District Judge